**FORT WAYNE EDUCATION ASSOCIATION, Appellant–Defendant,**

v.

**FORT WAYNE COMMUNITY SCHOOLS, Appellee–Plaintiff.**

No. 02A03–0006–CV–229.

Court of Appeals of Indiana.

July 16, 2001.

Publication Ordered Aug. 9, 2001.

Richard J. Darko, Eric M. Hylton, Lowe Gray Steele & Darko, LLP, Indianapolis, IN, Attorneys for Appellant.

William L. Sweet, Jr., Martha M. Kinder, Beckman Lawson LLP, Fort Wayne, IN, Attorneys for Appellee.

## OPINION

MATHIAS, Judge.

The Fort Wayne Education Association ("FWEA") appeals the trial court's grant of summary judgment, which vacated an arbitrator's award ordering the reinstatement of long-term substitute teacher Patrick McKinney, in favor of Fort Wayne Community Schools ("FWCS"). FWEA raises two issues, which we restate as the following three:

   I.    Whether the trial court erred in granting summary judgment on the basis that the arbitrator impermissibly modified the parties' collective bargaining agreement;

   II.   Whether the arbitrator's opinion and award violates public policy against sexual harassment and/or immorality; and

   III.   Whether reinstatement of a long-term substitute to a position that has been filled by a permanent teacher violates the master contract.

We reverse and remand with instructions.

### Facts and Procedural History

Patrick McKinney was employed as a long-term substitute teacher at Kekionga Middle School in Fort Wayne during the 1997–98 school year. On February 25, 1998, McKinney supervised a basketball practice in the school gym. During a break in the practice, McKinney placed his hands in his shorts and told J.H., an eighth-grade female student, that he did not like the new underwear he was wearing. About ten minutes later, McKinney told J.H. that he had something "cool" to show her, but not to tell her parents. He lifted his t-shirt and showed her that his nipple was pierced.

The next day, J.H. told her basketball coach about the incident and stated that it had made her feel "uncomfortable." R. at 92. At the coach's suggestion, J.H. also informed the school counselor and later the principal about the incident. The following day, a meeting was held with J.H., her parents, McKinney, the principal, and the counselor. At the meeting, McKinney apologized to J.H. for making her feel uncomfortable; the two shook hands; and they then went to the school gym to play basketball. J.H. stayed after the game and shot "three-pointers" with McKinney for a half hour.

Although FWCS informed Child Protective Services (CPS) of the incident, CPS

referred the matter back to the school. On March 13, the principal sent a letter to J.H.'s parents informing them of CPS's action and stating that FWCS would "follow established procedures that will provide appropriate disciplinary action." R. at 94. On April 6, FWCS sent McKinney a letter informing him that his employment was being terminated based on "inappropriate conduct by a teacher to a student, and confirmed allegations of sexual harassment." R. at 94.

Pursuant to the collective bargaining agreement between FWCS and FWEA, McKinney waived his right to a school board hearing and proceeded directly to binding arbitration. A hearing was held before an arbitrator on February 11, 1999. On May 26, 1999, the arbitrator issued a fifteen-page "Opinion and Award," which concluded that McKinney's actions were inappropriate but only warranted a sanction of a one-week suspension—not termination. The arbitrator ordered that McKinney be reinstated to his long-term substitute position and receive back pay less the one week disciplinary suspension.

On July 28, 1999, FWCS filed a Complaint for Application to Vacate and/or Modify or Correct an Arbitrator's Award in Allen Superior Court. FWEA responded, and both parties later moved for summary judgment. The trial court granted FWCS's motion for summary judgment and denied FWEA's motion. FWEA appeals.

### Standard of Review

■■■ Indiana's Uniform Arbitration Act, Ind.Code § 34-57-2-1 to -22 (1998), "provides a mechanism for enforcing agreements to arbitrate and for securing judicial review and enforcement of awards made." *School City of East Chicago, Ind. v. East Chicago Fed'n of Teachers Local No. 511*, 622 N.E.2d 166, 168 (Ind.1993) (quoting *School City of East Chicago, Ind.*

*v. East Chicago Fed'n of Teachers, Local No. 511*, 422 N.E.2d 656, 658 (Ind.Ct.App. 1981)). Judicial review of an arbitration award is extremely narrow in scope. *Id.* An award should only be set aside when one of the grounds specified by the Uniform Arbitration Act for vacation of an award is shown. *Id.* A party who seeks to vacate an arbitration award under the Uniform Arbitration Act bears the burden of proving the grounds to set the award aside. *Id.* The role of an appellate court in reviewing an arbitration award is limited to determining whether the challenging party has established any of the grounds permitted by the Uniform Arbitration Act. *Id.*

### I. Alleged Modification of the Collective Bargaining Agreement

■■ Indiana Code section 34-57-2-13(a) provides several grounds upon which a trial court may vacate an arbitration award. At issue here is section 13(a)(3): "the arbitrators exceeded their powers and the award can not be corrected without affecting the merits of the decision upon the controversy submitted." We have previously held that this provision is to be "narrowly construed. The statutory provision does not attempt to limit the discretion and powers of a neutral arbitrator to whom a controversy has been duly submitted." *Bopp v. Brames*, 677 N.E.2d 629, 631-32 (Ind.Ct.App.1997) (internal citation omitted).

In this case, the arbitrator entered a fifteen-page, single-spaced "Opinion and Award," discussing the applicable contract, the parties contentions, the evidence, and his findings and conclusions in great detail. Of relevance to this appeal are the arbitrator's conclusions that McKinney's acts of "adjusting [him]self publicly" and displaying his nipple ring to a student represent-

ed very poor judgment, and "taken individually or together, are inconsistent with a proper teacher role model." R. at 100. However, he noted neither act was "immoral" because baseball players routinely "adjust" themselves on televised games; the school had no policy on body piercings; and some students apparently had such piercings. In light of these considerations, the arbitrator concluded that "[s]ome discipline short of termination, therefore, is appropriate." R. at 100.

The arbitrator rejected FWEA's contention that the "role model" rule was unreasonable, but stated that

> "the penalty for violation of it is unreasonable. It calls for termination. Thus, if a young teacher came to work in a skirt that was too short, she could face termination for a violation of being a role model. While the business objective of having teachers be role models [sic], termination is too harsh for a plethora of possible violations, including the instant ones."

R. at 100. In a footnote discussing whether McKinney had received copies of the school role model and sexual harassment policies, the arbitrator concluded that constructive knowledge was imputed but that FWCS was "off base requiring termination for violations of either rule." R. at 101.

In its order vacating the arbitrator's opinion and award, the trial court recited these portions of the arbitrator's opinion and found them to be an impermissible modification of the contract.

> It is very apparent to this court that the arbitrator in this cause would not permit termination as a remedy for either a violation of the sexual harassment policy o[r] the role model policy....

> This court is fully cognizant that the arbitrator specifically referred to "progressive discipline" as an alternative to termination, but the overarching lan-

guage employed at footnote 12 gives this court great pause and concern that this arbitrator made a decision, in excess of his powers, that termination is not a remedy.

R. at 220. The trial court, based apparently on a selective reading of a few sentences of the arbitrator's fifteen-page opinion, concluded that the arbitrator had "impermissibly modified the contract to foreclose, under any circumstance, the remedy of termination." R. at 221. As a result, it vacated the arbitrator's decision and award.

FWCS bears the burden here, as it did in the trial court, of proving the grounds to set aside the arbitrator's award. *School City of East Chicago*, 622 N.E.2d at 168. Specifically, it must establish under section 13(a)(3) that the arbitrator exceeded his powers and the award cannot be corrected without affecting the merits of the controversy.

■ Echoing the trial court's findings, FWCS makes the tenuous claim that the arbitrator "effectively amended the agreement" by finding termination an impermissible penalty for violation of either the role model or sexual harassment policies. Brief of Appellee at 13. We disagree. Although the construction urged by FWCS might be plausible, it no more plausible than other interpretations, such as: that termination was an inappropriate remedy for the rather minor violations of these rules in this particular case. Indeed, the arbitrator explicitly acknowledged that "an employee may be terminated whose conduct makes a serious threat to children or whose behavior is inconsistent with the employee's position as a role model for children...." R. at 100. The arbitrator was not convinced, however, that McKinney's conduct was of such a magnitude. Moreover, as noted by the trial court, the

arbitrator explicitly referred to "progressive discipline, as well as termination." R. at 100. Other language also strongly suggests that the arbitrator considered termination to be an option, not a requirement.

Given our very narrow scope of review, we conclude that FWCS has not established that the arbitrator exceeded his powers; the trial court erred in concluding otherwise. However, that is not the end of our inquiry, as FWCS also asserts alternative bases for affirming the trial court, as discussed below.

## II. Sexual Harassment and Immorality

■ FWCS also contends that the grant of summary judgment was proper because the arbitrator's opinion violates public policy. Specifically, it argues that McKinney had engaged in sexual harassment and "immoral" conduct. The trial court did not address these issues because it vacated the arbitrator's opinion and award on other grounds.

The United States Supreme Court has held, "A court's refusal to enforce an arbitrator's award under a collective bargaining agreement because it is contrary to public policy is a specific application of the more general doctrine, rooted in the common law that a court may refuse to enforce contracts that violate law or public policy." *United Paperworkers Int'l v. Misco,* 484 U.S. 29, 42, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). Here, the arbitrator made the following findings:

Regarding the charge of sexual harassment, the Employer's policy regarding that subject defines it as: "... unwelcome sexual advances, requests for sexual favors, and other inappropriate verbal or physical conduct of a sexual nature when made by any employee to a student, when made by any employee to another employee, when made by any student to a school employee, or when made by any student to another student when:

a. Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment or education;

b. Submission to or rejection of such conduct by an individual is used as a basis for [an] academic or employment decision affecting that individual; or

c. Such conduct has the purpose or effect of substantially interfering with an individual's academic or professional performance or creating an intimidating, hostile, or offensive employment or educational environment."

Certainly, according to the above definitions, McKinney's behavior on February 25, 1998, did not rise to a level to constitute sexual harassment pursuant to subsections a. or b. above. These subsections refer to so-called *quid pro quo* sexual harassment. This form of sexual harassment contemplates a situation when someone with authority uses that authority to extract sexual favors by threatening the victim with adverse circumstances if he or she does not accede to the demands made. However, McKinney was no longer [J.H.]'s teacher at the time of the incidents in question, and had no power to [a]ffect her academically. Most importantly, there was no evidence that McKinney used his position as a teacher to demand sexual favors from [J.H.].

Thus, the only form of sexual harassment remaining in the definition, was subsection c. above, dealing with hostile environment harassment. In order for hostile environment sexual harassment to occur, an employee's misconduct must create an intimidating, hostile, or offensive educational environment. For this

to happen, the conduct must be sufficiently severe, persistent, and/or pervasive. Even assuming *arguendo* that the grievant's behavior was sexual in nature, it lacked severity and persistence. The Employer stipulated that there was no change in [J.H.]'s performance, attendance or disciplinary record after the incidents of February 25, 1998. Moreover, [J.H.] admitted that McKinney did not request sex with her or did he attempt to molest or touch her.

In addition, on the Friday following the incident in question, [J.H.] participated in a basketball game in which McKinney was playing, and after the game, she shot 3–point shots with him for a half an hour. Surely, if [J.H.] had still felt "uncomfortable" with McKinney, she would have neither played in the game or shot baskets with him. In addition, she practiced soccer while McKinney was the coach. Such post-event behavior by [J.H.] strongly indicates that she no longer felt discomfort in McKinney's presence and that the grievant's initial behavior was not "severe."

In sum, we have an incident which made [J.H.] uncomfortable for two or three days, but did not affect her relationship with McKinney nor was the behavior severe, persistent or pervasive. Indeed, it is reasonable to conclude that the grievant's behavior on February 25, 1998, was objectionable, but it was not sexual harassment.

R. at 98–99.

As the United States Supreme Court recently reiterated, a determination of whether conduct rises to the level of sexual harassment is not measured in isolation, but rather, "whether an environment is sufficiently hostile or abusive" is judged by looking at "all the circumstances," including the frequency, severity, and whether it is physically threatening, humiliating, or a mere offensive utterance. *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, ——, 121 S.Ct. 1508, 1510, 149 L.Ed.2d 509 (2001). "[S]imple teasing, off-hand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Id.* (quoting *Faragher v. Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (citation and quotation marks omitted)).

Here, as the arbitrator explained in his decision, McKinney's conduct was inappropriate but it was an isolated incident that, although disconcerting, can hardly be considered severe. The arbitrator did not manifestly disregard the law in concluding that McKinney's conduct was not sexual harassment. Accordingly, the arbitrator's opinion cannot be said to violate the public policy against sexual harassment.

In a similar vein, FWCS argues that the arbitrator's opinion and award violated "the well-established public policy in the State of Indiana against immoral conduct by teachers in schools." Brief of Appellee at 23. According to statute, a permanent teacher under contract with full tenure rights may be immediately terminated for "immorality." Ind.Code § 20–6.1–4–10(a)(1) (1998). In *Fiscus v. Board of School Trustees of Central School District of Greene County,* this court defined immorality as "not essentially confined to a deviation from sex morality; it may be such a course of conduct as offends the morals of the community and is a bad example to the youth whose ideals a teacher is supposed to foster and to elevate." 509 N.E.2d 1137, 1141 (Ind.Ct.App.1987), *trans. denied* (quoting *Horosko v. Mount Pleasant Township Sch. Dist.,* 335 Pa. 369, 6 A.2d 866, 868 (1939)).

The letter of termination sent to McKinney stated that "inappropriate conduct by

a teacher to a student"—and not "immorality"—was the second ground for termination. Immorality was only tangentially addressed by the arbitrator, who discussed it in the context of a violation of the "role model" policy. The arbitrator ultimately concluded that "adjusting oneself publicly ... represented very poor judgment," but was not immoral. R. at 100. The arbitrator similarly concluded that McKinney's display of his nipple ring, in light of the absence of any school policy on body piercings, "represented poor judgment" but was not immoral. McKinney's conduct, as explained above, was an isolated incident—not a course of conduct. Moreover, it does not rise to the level of conviction for any offense, let alone the serious sex offenses listed in Indiana Code section 20–6.1–4–10(a)(6) and cited by FWCS. The arbitrator did not manifestly disregard the law in concluding that McKinney's conduct was not immoral.

### III. Remedy

As a final point, we turn to the issue of remedy. The arbitrator ordered that McKinney "be reinstated to his long-term substitute job at Kekionga Middle School within five days after the receipt of this award. Back pay is from April 6, 1998 to October 15, 1998, less one-week's disciplinary suspension. He is also entitled to a full restoration of all benefits and seniority that may apply." R. at 101.

■ FWCS contends that reinstatement exceeded the scope of the arbitrator's authority under the master contract. The arbitrator relied on Article 10, Section B(1), which provides that "[a] substitute teacher serving in a 'long-term' assignment will not be replaced by another substitute without cause." R. at 101. The arbitrator reasoned that because "there was no cause for termination, McKinney should receive his long-term substitute as-

signment with Kekionga School." R. at 101.

■ Because arbitration arises through contract, the parties have defined what remedies may be afforded by arbitration, which must therefore conform to general principles of law. See *North Miami Educ. Ass'n v. North Miami Cmty. Schs.*, 736 N.E.2d 749, 757 (Ind.Ct.App.2000), aff'd on reh'g, 746 N.E.2d 380 (Ind.Ct.App. 2001). According to Article 5, Section C(5) of the master contract, an arbitrator is given the power to "declare the purported or proposed dismissal void and order such other relief as is necessary to protect the teacher's rights and security for the succeeding academic year." R. at 30.

McKinney, as a long-term substitute, had no "rights" or "security" for the succeeding academic year, except that he not be replaced by another substitute teacher without cause. Cf. *North Miami*, 736 N.E.2d at 757 ("Nonpermanent teacher's contract rights exist only with regard to a contract entered into for the present school year, and the decision to continue a nonpermanent teacher's contract is merely a decision to reemploy that teacher for another year."). Before the following academic year commenced, FWCS filled the teaching position once held by McKinney with "permanent teacher on a regular teacher's contract." R. at 102.

FWCS concludes that the award must be vacated because it "cannot be modified without affecting the merits." Brief of Appellee at 18. We disagree. The arbitrator found that McKinney had violated the role model policy but that a one-week suspension without pay, not termination, was the proper remedy. As explained in Part I above, the trial court erred in vacating this part of the arbitrator's award. Although termination was improper, FWCS nevertheless retained the power under the master contract to hire a regu-

lar teacher to fill the position for the next year as explained above.

The arbitrator exceeded his authority in ordering reinstatement for the following academic year. The only available remedy for the following year was ordering that McKinney's name be placed on the roster of eligible substitute teachers. In addition, back pay for the remainder of the 1997–98 academic year, less the one-week unpaid suspension, was also within the arbitrator's authority to award.

Accordingly, we remand this case with instructions to amend the arbitrator's award to provide as follows: "McKinney shall be reinstated to the list of substitute teachers available at Kekionga Middle School. He shall receive back pay from April 6, 1998 to the last day of the academic year, less one-week's disciplinary suspension." [1]

### Conclusion

The judgment of the trial court is reversed and this case is remanded with instructions to amend the arbitrator's award in accordance with this opinion.

BAILEY, J., and BAKER, J., concur.

### ORDER TO PUBLISH MEMORANDUM DECISION

This Court having heretofore handed down its opinion in this appeal on July 16, 2001, marked Memorandum Decision, Not for Publication;

Comes now the Appellant, by counsel, and files its Verified Motion to Publish Memorandum Decision, alleging therein that said opinion should be published because it clarifies a rule of law and involves a legal and factual issue of unique interest and substantial public importance, which said Motion is more particularly in the following words and figures, to wit:

(H.I.)

And the Court, having examined said Motion, having reviewed its opinion in this appeal, and being duly advised, now finds that said Motion should be granted, and that this Court's opinion heretofore handed down in this appeal on July 16, 2001, marked Memorandum Decision, Not for Publication, should now be ordered published.

IT IS THEREFORE ORDERED as follows:

1. The Appellant's Verified Motion to Publish Memorandum Decision is granted and this Court's opinion heretofore handed down in this cause on July 16, 2001, marked Memorandum Decision, Not for Publication, is ordered published.

---

1. FWCS concludes its brief with a request that we excise certain "extraneous statements" from the arbitrator's award because the statements "may impede FWCS from fulfilling its statutory obligations and duties in future circumstances." Brief of Appellee at 26. It cites *Fort Wayne Education Association v. Board of School Trustees of FWCS*, 569 N.E.2d 672, 680 (Ind.Ct.App.1991), in which this Court modified an award to excise certain statements which were "beyond the arbitrator's authority to determine." Here, the statements complained of were well within the purview of the arbitrator's authority. Moreover, we fail to see how these isolated statements can have any future precedential effect, as they are merely the opinion of one arbitrator, not adopted by this—or any other—court in the state.